[Cite as *McNee v. McNee*, 2017-Ohio-7700.]

STATE OF OHIO, COLUMBIANA COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| EDWARD L. McNEE, | ) | |
| | ) | |
| PLAINTIFF-APPELLANT, | ) | |
| | ) | CASE NO. 15 CO 0031 |
| V. | ) | |
| | ) | OPINION |
| AMANDA L. McNEE, | ) | |
| | ) | |
| DEFENDANT-APPELLEE. | ) | |

CHARACTER OF PROCEEDINGS:    Civil Appeal from Court of Common Pleas, Domestic Relations Division of Columbiana County, Ohio
Case No. 2013-DR-0018

JUDGMENT:    Affirmed

APPEARANCES:
For Plaintiff-Appellant    Attorney Christopher A. Maruca
201 E. Commerce St., Suite 316
Youngstown, Ohio 44503

For Defendant-Appellee    Attorney Charles E. Dunlap
7330 Market Street
Youngstown, Ohio 44512

JUDGES:

Hon. Gene Donofrio
Hon. Mary DeGenaro
Hon. Carol Ann Robb

Dated: September 14, 2017

DONOFRIO, J.

{¶1} Plaintiff-appellant, Edward McNee, appeals from a Columbiana County Domestic Relations Court decision granting a divorce to him and defendant-appellee, Amanda McNee.

{¶2} The parties were married on September 25, 2009. They have one child. Appellant filed for divorce on January 14, 2013.

{¶3} The matter proceeded to a trial before a magistrate. Relevant to this appeal, the magistrate heard testimony regarding the valuation of appellant's businesses, the ownership and valuation of certain guns and a jukebox, the amount of child support, the valuation of a parcel of real property in Michigan, and alleged financial misconduct by appellee. Appellant owns three businesses, JaSar Recycling, Inc., JaSar Enterprises, LLC, and Liquid Luggers, LLC. The magistrate heard testimony from both parties, experts who valued the business, and several other witnesses.

{¶4} The magistrate made the following determinations relevant to this appeal. Appellant's businesses' value increased by $284,000 during the marriage. Appellant's child support obligation is $1,062.60 per month. Appellee did not commit financial misconduct. A jukebox purchased by appellant is marital property. Nine guns are marital property. Certain real property located in Michigan has a value of $7,600. Appellant is required to pay for appellee's litigation expenses in the amount of $7,700.

{¶5} Appellant filed objections to the magistrate's decision. Specifically, appellant raised objections regarding the magistrate (1) failing to consider his spousal support payment in computing child support; (2) failing to credit him for a debt appellee discharged in bankruptcy; (3) designating a jukebox as marital property; (4) valuing property in Michigan at $7,600; (5) designating nine guns as marital property; (6) requiring him to pay for appellee's expert; (7) determining the marital value of the businesses; and (8) terminating temporary spousal support when it did.

{¶6} The trial court overruled appellant's objections and adopted the magistrate's decision as the order of the court. Appellant filed a timely notice of appeal on December 23, 2015. The trial court issued a stay of its order pending this

appeal.

{¶7} Appellant now raises six assignments of error.

{¶8} Appellant's first assignment of error states:

THE TRIAL COURT AND THE MAGISTRATE ABUSED THEIR DISCRETION AND COMMITTED AN ERROR OF LAW BY IMPROPERLY VALUING THE BUSINESSES BASED UPON A LOAN GRANTED TO THE COMPANY AND WITHOUT ANY STATED METHODOLOGY OR FACTUAL BASIS.

{¶9} Appellant argues the trial court abused its discretion by failing to ascertain the businesses' premarital and post-marital values. Appellant points to the magistrate's findings as to the businesses' values.

{¶10} The magistrate found that the businesses' values increased by $284,000 during the marriage based on a loan from appellant made during the marriage. He further found the businesses continue to provide appellant an income in excess of $300,000 per year.

{¶11} Appellant argues the court failed to consider the evidence he presented that the businesses had a premarital value of $776,000 and, during the course of the marriage, the businesses' value fell to $104,192. Appellant's appraiser, therefore, concluded the businesses had no marital value. Appellant does not dispute that the businesses provide him with an income. But he asserts the income stream is different from the actual value of the businesses.

{¶12} Next, appellant asserts because the evidence was uncontroverted that the businesses' premarital value was $776,000, it was an abuse of discretion not to accept this valuation. Appellant claims the trial court failed to use any type of methodology in valuing the businesses.

{¶13} Finally, appellant points out that even under appellee's valuation of the businesses, their value decreased from their premarital value. Therefore, he contends the court erred in finding that the businesses' value increased during the marriage.

**{¶14}** The trial court is not required to adopt any particular methodology in determining a business's value. *Brown v. Brown*, 8th Dist. No. 100499, 2014-Ohio-2402, ¶ 32. "In determining a business's value, the trial court has discretion to weigh the testimony offered by the parties' valuation experts." *Id.* It has broad discretion in determining which expert to believe in assigning a value to marital property. *Cronin v. Cronin*, 2d Dist. No. 02-CA-110, 03-CA-75, 2005-Ohio-301, ¶ 13. Thus, we will not disturb the trial court's decision absent an abuse of discretion. Abuse of discretion connotes more than an error of law or judgment; it implies that the trial court acted unreasonably, arbitrarily, or unconscionably. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

**{¶15}** Two of appellant's businesses were in existence prior to the marriage (JaSar Recycling and JaSar Enterprises) while Liquid Luggers was started during the marriage. Both parties presented valuation experts who valued the businesses' combined value.

**{¶16}** The magistrate noted that appellant's expert, William Leicht, valued the business in 2006, three years prior to the marriage, at a value of $776,000. As of the date of the trial, Leicht testified that the businesses were now valued at only $104,192. He opined the businesses had no marital value due to continuing losses.

**{¶17}** The magistrate noted that appellee's expert, Kelly Bianco, determined that the businesses increased in value during the marriage by $365,000. Bianco opined that $72,000 of the increase was due to an increase in value while $284,000 of the increase resulted from a shareholder note. This note was a personal loan from appellant to the businesses during the marriage, which may or may not be repaid.

**{¶18}** The magistrate found that the businesses increased in value by $284,000 during the course of the marriage based on the loan from appellant. The magistrate observed that another way to view this transaction would be to consider the note owed to appellant as a marital asset. However, the magistrate also found he was not persuaded that the businesses' value had increased by $72,000, as Bianco had opined.

**{¶19}** In considering appellant's objection on this issue, the trial court found

that the magistrate's findings were supported by Bianco's testimony along with the testimony of Steve Higgins, another valuation expert. It determined that the $284,000 could either be considered a contribution to the capital of the businesses, which increased their value by $284,000, or it could be considered a martial debt owed to the parties. The court noted that Higgins testified that no matter how the $284,000 was classified, it was available to appellant who could take the money out for his own use.

**{¶20}** Leicht, appellant's expert, testified that on August 14, 2006, the date of appellant's prior divorce, the businesses were valued at $776,000. (3/3/15 Tr. 129-131). Leicht also gave his opinion as to the value of the businesses of March 4, 2014, which was considered the end date of this marriage. Leicht testified that he determined the value of the businesses was $104,193. (3/3/15 Tr. 131; Pl. Ex. 25). Leicht stated that there are four common ways to value businesses: (1) capitalization of earnings; (2) discounted cash flow; (3) net book value; and (4) forecasting. (3/3/15 Tr. 132). Leicht used the capitalization of earnings method to value appellant's businesses. (3/3/15 Tr. 134). Leicht concluded there was no marital value to the businesses. (3/3/15 Tr. 138).

**{¶21}** Leicht also took issue with the valuation by appellee's expert. He approved of her methodology but he took issue with the way she paid down debts of the businesses. (3/3/ Tr. 138, 143). He testified she should not have taken into account $150,000 appellant used to pay down the debt. (3/3/15 Tr. 144-145).

**{¶22}** Higgins, another expert called by appellant, testified that although he did not take issue with the method appellee's expert used to value the businesses, he did take issue with how she arrived at her numbers. (3/3/15 Tr. 179). He too opined that she increased the businesses' value by $150,000 and that she did not properly account for the shareholder note for the money appellant put into the businesses. (3/3/15 Tr. 181-182).

**{¶23}** On cross examination, however, Higgins testified that no matter how the $284,000 that appellant put into the businesses was classified, it was available to appellant who could take the money out for his own use. (3/3/15 Tr. Tr. 189-190).

And Higgins also opined that it was not proper to rely on the valuation from 2006 in determining the premarital value of the businesses in 2009. (3/3/15 Tr. 207-208).

**{¶24}** Kelly Bianco, appellee's expert, testified that the 2006 valuation from appellant's prior divorce had become "stale," since it was more than a year old. (3/3/15 Tr. 214). She testified that she valued the businesses at $266,000 on March 4, 2014. (3/3/15 Tr. 215). She stated that she valued the businesses as of September 25, 2009, the date of the marriage, to determine that from the beginning date of the marriage to the end date of the marriage the businesses increased in value by $72,000. (3/3/15 Tr. 231-232). She then added to the increased value, a shareholder's note of $284,000. (3/3/15 Tr. 232). She stated that $284,000 could be considered either a loan from appellant to the businesses or it could be considered equity in the company. (3/3/15 Tr. 233). Adding the $284,000 note to the $72,000 increase she had already determined, Bianco opined the businesses had increased by $356,000 since the date of the marriage.

**{¶25}** This is a case of competing experts. Leicht testified as to what he believed the businesses' marital value was and Bianco testified as to what she believed their marital value was. Higgins agreed with Leicht on some matters, such as his disapproval of Bianco's valuation. But he also agreed with Bianco that the $284,000 that appellant put into the businesses was available to appellant. And Higgins agreed that it was not proper to rely on a valuation from 2006 in determining the premarital value of the businesses in 2009.

**{¶26}** We cannot conclude that the trial court abused its discretion in finding the businesses increased in value during the marriage by $284,000. The court simply had to choose which expert opinion to place more weight on. The court did not find credible the testimony that the businesses' value increased by an additional $72,000 above the shareholder's note. But it found that because appellant had put $284,000 into the businesses during the marriage, that money was either a debt owed by the businesses to appellant or that money was appellant's to withdraw from the businesses when he saw fit. One of appellant's experts even agreed with this. Either way, the court found that the money was a marital asset.

**{¶27}** Appellant also contends it was error for the court not to accept the businesses' premarital value of $776,000. But this value was not placed on the businesses at the inception of the parties' marriage. This value was placed on appellant's businesses when he divorced his first wife in 2006. The parties to this case did not marry until September 25, 2009. Thus, the 2006 value was three years old by the time the parties married and there was no testimony as to how those three years between 2006 and 2009 affected the 2006 valuation. Thus, there was not evidence as to the premarital value of the businesses.

**{¶28}** Accordingly, appellant's first assignment of error is without merit and is overruled.

**{¶29}** Appellant's second assignment of error states:

THE TRIAL COURT AND THE MAGISTRATE ABUSED THEIR DISCRETION AND COMMITTED AN ERROR OF LAW BY FAILING TO FACTOR IN APPELLANT'S CURRENT SPOUSAL SUPPORT OBLIGATION TO HIS EX-WIFE WHEN CALCULATING CHILD SUPPORT.

**{¶30}** The magistrate stated that in calculating child support, he did not consider appellant's spousal support from a prior marriage because that obligation was scheduled to end in July 2015 (the magistrate's decision was issued in April 2015).

**{¶31}** On appellant's objection, the trial court noted that the magistrate took judicial notice of appellant's spousal support obligation from a prior marriage. The court found that appellant was ordered to pay spousal support to his first ex-wife in the amount of $4,800 per month for 108 months commencing on August 1, 2006. The court found that the magistrate considered the particular facts of this case including appellant's spousal support obligation. The court also found that the magistrate capped appellant's annual income at $150,000 and did not use his adjusted gross income of $330,000 in calculating child support. The court found the magistrate complied with R.C. 3119.04(B) and used a reasonable means to calculate

child support. Because this case involved a situation where the parties' income exceeded $150,000, the court found the magistrate was not constrained by the child support worksheet in calculating appellant's obligation. The court concluded that the magistrate correctly determined child support.

{¶32} Here appellant contends the court erred in adopting the magistrate's child support worksheet. He asserts the worksheet failed to take into consideration the spousal support he was paying his ex-wife of over $50,000 per year. Appellant claims that R.C. 3119.05(B) mandates that spousal support payments actually made must be deducted from his gross income when computing his current child support obligation.

{¶33} In reviewing matters concerning child support, appellate courts look at whether the trial court abused its discretion. *Booth v. Booth*, 44 Ohio St.3d 142, 144, 541 N.E.2d 1028 (1989).

{¶34} R.C. 3119.05(B) provides that when computing a child support obligation:

> The amount of any pre-existing child support obligation of a parent under a child support order and *the amount of any court-ordered spousal support actually paid shall be deducted from the gross income* of that parent to the extent that payment under the child support order or that payment of the court-ordered spousal support is verified by supporting documentation.

(Emphasis added).

{¶35} Generally, a court calculates child support using the worksheet provided in R.C. 3119.022 with reference to the child support schedule set forth in R.C. 3119.021. *Bajzer v. Bajzer*, 9th Dist. No.25635, 2012-Ohio-252, ¶ 5. But when the combined gross income of the parents exceeds $150,000, the court calculates child support under R.C. 3119.04(B), which provides:

> If the combined gross income of both parents is greater than one

hundred fifty thousand dollars per year, the court, with respect to a court child support order * * * shall determine the amount of the obligor's child support obligation on a case-by-case basis and shall consider the needs and the standard of living of the children who are the subject of the child support order and of the parents. The court or agency shall compute a basic combined child support obligation that is no less than the obligation that would have been computed under the basic child support schedule and applicable worksheet for a combined gross income of one hundred fifty thousand dollars, unless the court or agency determines that it would be unjust or inappropriate and would not be in the best interest of the child, obligor, or obligee to order that amount. If the court or agency makes such a determination, it shall enter in the journal the figure, determination, and findings.

**{¶36}** In this case, the court determined appellant's gross income to be $331,877. It imputed full-time, minimum wage income to appellee of $15,080. The court calculated child support based on a combined gross income of $150,000. It found this calculation appropriate in this case since, in addition to child support, appellant was providing health insurance for the child, paying all uninsured medical expenses for the child, paying the child's tuition at a private school, and paying the costs associated with all school activities. And because appellant's spousal support obligation to his first ex-wife was to end just three months after the magistrate's decision, and before the trial court issued its final judgment entry, the court did not deduct it from appellant's gross income.

**{¶37}** Given the facts of this case, the trial court did not abuse its discretion in determining not to deduct appellant's spousal support obligation from his gross income. Because the parties' gross income exceeded $150,000, the court was not obligated to strictly adhere to the child support worksheet. Moreover, at the time of the magistrate's decision, appellant's spousal support obligation to his ex-wife was set to end in three months and at the time of the trial court's judgment, his spousal

support obligation had ended. Thus, the trial court did not abuse its discretion by not deducting the spousal support payment from appellant's gross income.

{¶38} Accordingly, appellant's second assignment of error is without merit and is overruled.

{¶39} Appellant's third assignment of error states:

THE TRIAL COURT AND THE MAGISTRATE ABUSED THEIR DISCRETION BY FAILING TO PROPERLY CREDIT APPELLANT FOR THE DEBT APPELLEE OWED TO APPELLANT AND DISCHARGED THROUGH BANKRUPTCY.

{¶40} Relevant to this assignment of error, the magistrate and the trial court found that in 2007, prior to the parties' marriage, appellant loaned appellee $90,000 to purchase a house on Pearl Street. Appellee signed a cognovit note for the loan. Appellee never made a payment on the note. In 2013, appellant received a judgment in common pleas court on the cognovit note for $90,000, plus interest. Appellant then filed a complaint in foreclosure seeking the sale of the Pearl Street property. Next, appellee filed for Chapter 7 bankruptcy and listed the debt owed to appellant as $90,000 secured debt and $30,000 unsecured debt. Appellant argued at the divorce trial that appellee engaged in financial misconduct by discharging the unsecured portion of the debt in bankruptcy.

{¶41} In this assignment of error, appellant claims the trial court failed to credit him for a debt that appellee discharged through bankruptcy while the divorce was pending. Appellant asserts that appellee discharged more than $30,000 in debt owed to him stemming from a judgment obtained by him in common pleas court. Appellant contends appellee engaged in financial misconduct by discharging the debt in order to escape a penalty in the divorce proceedings. Therefore, he claims the court should have created an offset in his favor in the amount of $30,000.

{¶42} An appellate court will not disturb a trial court's finding regarding financial misconduct absent an abuse of discretion. *Carpenter v. Carpenter*, 7th Dist. No. 06-NO-331, 2007-Ohio-1238.

**{¶43}** R.C. 3105.171(E)(3) provides guidance on financial misconduct during a marriage:

> If a spouse has engaged in financial misconduct, including, but not limited to, the dissipation, destruction, concealment, or fraudulent disposition of assets, the court may compensate the offended spouse with a distributive award or with a greater award of marital property.

**{¶44}** The burden of proving financial misconduct for purposes of R.C. 3105.171(E)(3) is on the complaining spouse. *Jacobs v. Jacobs*, 4th Dist. No. 02CA2846, 2003-Ohio-3466, at ¶ 25. Financial misconduct implies that there was some type of wrongdoing by the offending spouse whereby that spouse will either profit from the misconduct or intentionally defeat the other spouse's distribution of marital assets. *Wideman v. Wideman*, 6th Dist. No. WD-02-030, 2003-Ohio-1858, at ¶ 34.

**{¶45}** The trial court did not abuse its discretion by finding no financial misconduct and by not awarding appellant a corresponding credit.

**{¶46}** Appellant testified that while the parties were dating, he purchased the Pearl Street property and put the title in appellee's name. (2/27/15 Tr. 169). He paid the entire $91,000 purchase price by writing a check for that amount. (2/27/15 Tr. 169-170). Appellee signed a promissory note to pay appellant back for the purchase of the property. (2/27/15 Tr. 170). Appellee, however, never paid him back. (2/27/15 Tr. 170).

**{¶47}** While the divorce was pending, appellant sued appellee and received a judgment on the promissory note. (2/27/15 Tr. 170). Appellee then filed for bankruptcy. (2/27/15 Tr. 170).

**{¶48}** Appellant testified that, now that the bankruptcy was concluded, he would be receiving the Pearl Street property worth $90,000, which was the appraised value. (2/27/15 Tr. 171). But he would not receive the $30,000 in interest, which his judgment reflected appellee owed him. (2/27/15 Tr. 172). Appellant testified he believed he deserved a credit for that amount. (2/27/15 Tr. 173).

**{¶49}** Appellee testified that she never made a payment to appellant for the Pearl Street house and he never asked her to make a payment. (3/3/15 Tr. 87). She stated that once appellant received a judgment on the note, she included it in her bankruptcy because she could not afford to pay it. (3/3/15 Tr. 88).

**{¶50}** Appellant admitted that he would now receive the Pearl Street property worth $90,000 and appellee would have no right to it. Moreover, appellant never required appellee to make a payment on the note while the parties were married. Presumably, had they remained married, appellant would never have collected on the note. The court's decision left the parties in the same position they would have been had appellant never purchased the property for appellee in the first place. By way of the bankruptcy, appellant was restored to the same position he would have been in had he not given the property to appellee in the first place. Thus, we cannot conclude that the trial court abused its discretion in finding no financial misconduct and in deciding not to award appellant a credit in this matter.

**{¶51}** Accordingly, appellant's third assignment of error is without merit and is overruled.

**{¶52}** Appellant's fourth assignment of error states:

THE TRIAL COURT AND THE MAGISTRATE ABUSED THEIR DISCRETION BY IMPROPERLY CREDITING CERTAIN PIECES OF PERSONAL PROPERTY AS BEING MARITAL AND IMPROPERLY CREDITING THEIR VALUE, SPECIFICALLY INCLUDING A JUKEBOX AND FIREARMS.

**{¶53}** The magistrate found that appellant purchased a jukebox for $8,500 shortly before the parties separated. The magistrate found the jukebox to be marital property in appellant's possession.

**{¶54}** On appellant's objection, the trial court found appellant failed to prove the jukebox was his separate property. The court noted that appellant claimed he sold the jukebox to "Lou" on December 8, 2012, which was before the parties separated. Therefore, the court found the jukebox was marital property and appellant

was responsible for it even if he sold it as he claimed.

**{¶55}** Appellant asserts that the trial court ignored the testimony and evidence that the jukebox was sold on December 8, 2012, during the marriage. He contends the court abused its discretion by imputing the value of the jukebox as a marital asset against him. Appellant claims that while he does presently own a jukebox, he purchased it after the parties separated.

**{¶56}** We review a trial court's decision designating property as either a marital asset or separate property for abuse of discretion. *Knox v. Knox*, 7th Dist. No. 04 JE 24, 2006-Ohio-1154, ¶ 47.

**{¶57}** As to the jukebox, appellant testified he purchased a 1955 Seeburg jukebox in 2011, from someone named "Lou." (2/27/15 Tr. 192-193). Appellant testified that he no longer had that particular jukebox in his possession. (2/27/15 Tr. 194). He testified that he sold that juke box back to Lou on December 8, 2012 (before the parties separated). In support of this testimony, appellant submitted a handwritten receipt with the name "Unique Music Machines" written on the top and stating "1 1955 fully * * *& Juke Box Paid $8,500 CASH." (Pl. Ex. 23).

**{¶58}** Appellant then testified that he purchased another jukebox from Lou in November 2014 (after the parties separated). (2/27/15 Tr. 254). He also stated that the records in the jukebox came with it. (2/27/15 Tr. 255).

**{¶59}** To the contrary, appellee testified that she saw the original Seeburg jukebox in appellant's garage less than a month before the trial. (3/3/15 Tr. 68-69). She stated that she got a good look at the jukebox and it looked exactly the same as the one they had purchased during the marriage. (3/3/15 Tr. 69). Moreover, she stated that she had picked out the music that came with the original jukebox and when she looked at the one in appellant's garage it was the same music. (3/3/15 Tr. 69).

**{¶60}** Appellant and appellee presented conflicting testimony on whether the jukebox in appellant's garage was the same jukebox purchased during the marriage. Appellant did present a receipt that he claims supported his testimony that he sold the marital jukebox. But the receipt is handwritten on a generic blank receipt page.

And while it lists the amount of $8,500 cash, it does not say whether the jukebox was purchased from appellant or whether appellant purchased another jukebox for that amount. Thus, it was within the magistrate's and court's discretion to give the receipt little weight. Therefore, this issue is one of credibility.

{¶61} Appellant testified he sold the marital jukebox. Appellee testified she recently saw the marital jukebox in appellant's garage. The magistrate, as the fact-finder, was in the best position to watch the witnesses and observe their demeanor, gestures, and voice inflections and to utilize these observations in weighing credibility. *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984). Given the conflicting testimony and our deferral to the trier of fact on credibility issues, we conclude that the trial court did not abuse its discretion in finding the jukebox to be marital property.

{¶62} The trial court also determined that nine guns were marital property worth $8,600.

{¶63} In his findings, the magistrate acknowledged that Christopher Toy, appellant's friend and employee, testified that six of the nine guns in question belonged to him, although they were kept at the marital home. The magistrate found Toy's testimony was vague as to when he purchased them and his explanation as to why he kept the guns at appellant's home was unconvincing. The magistrate further found Toy's testimony was tainted by his personal and professional relationship with appellant. Therefore, the magistrate found all nine of the guns were marital property with a total value of $8,600.

{¶64} In considering appellant's objection, the trial court found that Toy was unable to provide many details regarding the six guns in question because he buys guns "on a whim" from friends and garage sales. The court noted that even appellant acknowledged that Toy's testimony was confusing in at least one respect. And the court noted that although Toy testified that he kept "his" guns in a gun safe at the parties' marital home, neither the gun safe nor its contents appeared on the inventory and appraisal of the parties' personal property. The court further pointed out that appellee testified that all nine guns were in the marital home when she lived there

and all of the guns were marital. Moreover, the court found that appellee's testimony undermined Toy's testimony because she removed one of the guns from the marital home that Toy claimed to have given to his brother.

**{¶65}** As to the guns' value, the trial court pointed to Thomas Couche's testimony that he is a police officer and firearms instructor. The court noted that Couche testified as to the steps he took to value the nine guns.

**{¶66}** Therefore, the trial court overruled appellant's objection and determined that the magistrate correctly determined the facts and applied the law.

**{¶67}** Appellant urges this determination was in error in two respects. First, he asserts that both he and Christopher Toy testified that six of the nine guns belonged to Toy who stored them in appellant's gun safe and, therefore, those six guns were not marital property.

**{¶68}** Appellant's friend and employee, Christopher Toy, testified that of the nine guns appellee claimed were marital property, six of them belonged to him. (Def. Ex. 15, 2/27/15 Tr. 49). Specifically, Toy identified a Teddy Roosevelt 30-30, a 700 Remington, a 12-gauge shotgun, a Winchester 16-gauge double barrel, a Rock Island Armory, and a "little .22" as belonging to him. (2/27/15 Tr. 44-48).

**{¶69}** When asked why he kept his guns at appellant's house, Toy stated, "[b]ecause I'm married and I don't like leaving guns laying around my house." (2/27/15 Tr. 50). But he also stated that he did keep two guns at his house that he used for concealed carry. (2/27/15 Tr. 50).

**{¶70}** Toy testified that he purchased the Teddy Roosevelt gun a year to a-year-and-a-half ago. (2/27/15 Tr. 58). He stated he bought the 12-gauge shotgun two years prior. (2/27/15 Tr. 46). Toy testified that he had acquired the Winchester 16-gauge double barrel a year ago after it was traded to his brother. (2/27/15 Tr. 46-47, 60). And he testified that he purchased the Rock Island Armory about two years ago. (2/27/15 Tr. 47-48). Toy did not have receipts or other proof of purchase for any of the guns. (2/27/15 Tr. 61-62).

**{¶71}** Appellant testified that of the nine guns that appellee claimed as marital property, only three of them belonged to him. (2/27/15 Tr. 187). He identified a

Model 2B2 ultra, a Colt .357, and a Colt .22 as belonging to him. (2/27/15 Tr. 188). Appellant agreed that these three guns were marital property. (2/27/15 Tr. 189). The other six guns, appellant testified, belonged to Toy. (2/27/15 Tr. 188).

{¶72} Appellee testified that when she left the marital residence, she took the guns with her. (3/3/15 Tr. 54). Appellant also acknowledged that on February 4, 2013, he filed a motion to compel appellee to return the guns to him. (2/27/15 Tr. 267-268). However, the motion did not identify any specific guns nor did it state that any of the guns belonged to anyone other than appellant. (2/27/15 Tr. 268). Appellee testified she returned the guns, including the Winchester 16-gauge, to appellant within a week of receiving the motion. (3/3/15 Tr. 55, 56-57).

{¶73} Appellant stated that some of Toy's dates were "off." (2/27/15 Tr. 271). He stated that Toy was "off" by a whole year as to when he acquired the Winchester 16-gauge from his brother. (2/27/15 Tr. 272). When asked then if he agreed that Toy's testimony was "quite questionable" appellant responded, "Yes, I do." (2/27/15 Tr. 273).

{¶74} Appellee stated that during the course of the marriage she was never told that any of the guns did not belong to her and appellant. (3/3/15 Tr. 55). She stated she was with appellant when he purchased some of the guns. (3/3/15 Tr. 55). She also stated that she and appellant went target shooting at Toy's house and brought all of the guns and Toy never mentioned that any of them belonged to him. (3/3/15 Tr. 55-56).

{¶75} Once again the issue here is one of credibility. Whether the six guns Toy claimed to own were in fact Toy's or were instead marital property depended on whether the magistrate and the trial court found Toy's testimony to be credible. And once again, the magistrate, as the fact-finder, was in the best position to weigh the witnesses' credibility. *Seasons Coal Co., Inc.*, 10 Ohio St.3d at 80. It is significant that Toy testified that he had just acquired the Winchester 16-gauge in the year prior to trial, which would have been between March 2014 and March 2015. Yet the Winchester was with the rest of the guns in February 2013. This likely hurt Toy's credibility and called into question whether his testimony was truthful.

**{¶76}** Because this was a matter within the trial court's discretion and given the conflicting testimony, we cannot conclude that the court abused its discretion in determining all nine guns to be marital property.

**{¶77}** Next, appellant asserts the court should not have accepted the testimony of Thomas Couche, appellee's boyfriend, as to the value of the guns.

**{¶78}** A trial court's valuation of marital assets will not be reversed absent an abuse of discretion. *Callender v. Callender*, 7th Dist. No. 03-CA-790, 2004-Ohio-1382, ¶ 9.

**{¶79}** Appellee's boyfriend, Thomas Couche, is a detective-sergeant police officer and firearms instructor for a local police department. (3/3/15 Tr. 8). As part of his duties, Couche is in charge of trading/selling guns that are seized by the police department and using the money for other purposes at the police department. (3/3/15 Tr. 8). It is left up to his discretion to get a fair price on the guns. (3/3/15 Tr. 8). Based on his experience, Couche considers the guns' condition and what their value is. (3/3/15 Tr. 10).

**{¶80}** Couche testified appellee brought the guns from the marital home and stored them in his gun safe. (3/3/15 Tr. 10). In response to appellant's motion to return the guns, Couche suggested to appellee that they should photograph and inventory the guns before returning them to appellant. (3/3/15 Tr. 11). Couche stated that he personally examined each of the nine guns. (3/3/15 Tr. 12). Couche then valued each gun individually. (3/3/15 Tr. 17-18; Def. Ex. 22). He gave the guns a total value of $8,600. (Def. Ex. 22).

**{¶81}** Appellant testified that the total value of the three guns that he admitted were his was $2,450. (2/27/15 Tr. 188-189). These same three guns Couche valued at $3,300. (Def. Ex. 22).

**{¶82}** There is no indication that the trial court abused its discretion in accepting Couche's values on the guns. Couche is a police officer and firearms instructor who determines the values of firearms as part of his job. He personally examined each of the guns in question before valuing it. Appellant did not offer an opinion on the value of the six guns he claimed not to own. So for those six guns,

Couche's valuation was the only evidence the trial court had with which to value the guns. And as to the three guns appellant agreed were marital property, the total difference in value between what Couche valued them at and what appellant opined they were worth was only $850. Thus, the trial court acted within its discretion in accepting Couche's value of the guns.

**{¶83}** Accordingly, appellant's fourth assignment of error is without merit and is overruled.

**{¶84}** Appellant's fifth assignment of error states:

THE TRIAL COURT AND THE MAGISTRATE ABUSED THEIR DISCRETION BY IMPROPERLY VALUING A CERTAIN PIECE OF REAL PROPERTY LOCATED IN THE STATE OF MICHIGAN.

**{¶85}** The magistrate, and then the trial court, determined that a parcel of real property in Michigan was worth $7,600. It based this finding on the value listed on a tax bill. The parties agreed that it is marital property.

**{¶86}** Appellant argues the valuation of the Michigan property was in error because there was never an appraisal done and there was no agreement as to its value. Appellant points to his own testimony that he purchased the property for $12,000. Therefore, he claims it was error to value the property for less than $12,000.

**{¶87}** As to the value of the Michigan property, appellee submitted a copy of the tax record for the property. (Def. Ex. 17). The tax record listed the taxable value of the property for the year 2013 as $7,561 and listed the assessed value for 2014 as $7,600.

**{¶88}** Appellant testified that he did not agree with the value listed in the tax records. (2/27/15 Tr. 139). He testified that he paid $12,000 for the property. (2/27/15 Tr. 139). However, he had no proof of the purchase price and did not have an appraisal of the property. (2/27/15 Tr. 140, 225).

**{¶89}** As stated above, we will not reverse the trial court's valuation of marital assets absent an abuse of discretion. *Callender*, supra. There is no indication here

that the trial court abused its discretion in valuing the Michigan property. Appellant testified that he paid $12,000 for the property but he had no documentation to corroborate his testimony. Appellee submitted a copy of the tax records for the property, which assessed it a value of $7,600. Neither party submitted a formal appraisal. Given the limited evidence, the trial court acted within its discretion in accepting the tax value as the value of the Michigan property.

{¶90} Accordingly, appellant's fifth assignment of error is without merit and is overruled.

{¶91} Appellant's sixth assignment of error states:

THE TRIAL COURT AND THE MAGISTRATE ABUSED THEIR DISCRETION BY ORDERING APPELLANT TO BE RESPONSIBLE FOR DEFENDANT'S COST OF EVALUATING PLAINTIFF'S BUSINESSES WITHOUT ANY TESTIMONY AS TO THE COST BASIS OF THE WORK PERFORMED.

{¶92} The magistrate ordered appellant to pay the $7,700 incurred by appellee to hire an expert to value appellant's businesses. In so doing, the magistrate reasoned that appellee clearly did not have the resources to pay this expense and appellant clearly did have the resources to pay. Therefore, the magistrate included this payment by appellant as part of the global settlement of assets.

{¶93} On appellant's objection, the trial court noted that the ability to pay was a relevant consideration here. It further determined that the business evaluations were necessary to determine the marital value of the businesses in this case. Therefore, the trial court overruled appellant's objection and adopted the magistrate's decision.

{¶94} In his final assignment of error, appellant claims the trial court erred in ordering him to pay for appellee's business valuation. He notes that the valuation was not part of any court order and appellee did not present any evidence as to the reasonableness of the cost she incurred. Appellant claims that without a

determination as to the appropriateness of the cost and opportunity to cross examine regarding the cost, it was an abuse of discretion for the court to order him to pay for the valuation.

**{¶95}** R.C. 3105.73(A) provides that in a divorce action,

a court may award all or part of reasonable attorney's fees and litigation expenses to either party if the court finds the award equitable. In determining whether an award is equitable, the court may consider the parties' marital assets and income, any award of temporary spousal support, the conduct of the parties, and any other relevant factors the court deems appropriate.

**{¶96}** We will not reverse a trial court's judgment awarding litigation expenses absent an abuse of discretion. *Hogan v. Hogan*, 12th Dist. Nos. CA2007-12-137, CA2007-12-141, 2008-Ohio-6571, ¶ 50.

**{¶97}** In this case, appellee submitted her bill from Hill, Barth, & King for the cost of valuing appellant's businesses. (3/3/15 Tr. 62; Def. Ex. 20). The total bill was $7,700. (Def. Ex. 20).

**{¶98}** Appellant's counsel cross-examined appellee about why she did not submit this litigation expense earlier when appellant was ordered to pay expenses incurred for appraising the parties real and personal property. (3/3/15 Tr. 106-108). However, she had not yet hired a business valuation expert at that time. (3/3/15 Tr. 107-108).

**{¶99}** A trial court may consider the parties' relative ability to pay attorney fees or litigation expenses when deciding what is equitable under the facts of a particular case. *Lewis v. Lewis*, 7th Dist. Nos. 06 JE 49, 07 JE 27, 2008-Ohio-3342, ¶ 116. In this case, appellant was the sole income provider throughout the marriage. Appellee now works only one or two days per week. Given that appellant is gainfully self-employed, the trial court properly considered the parties' relative ability to pay the cost of the business valuation.

**{¶100}** Additionally, appellant claims he was not given the opportunity of

cross examination on the issue of the cost of the valuation. But appellee submitted her bill from her expert. (Def. Ex. 20). And appellant had the opportunity to cross examine both appellee and her expert. Thus, appellant could have inquired to the reasonableness of the cost of the valuation.

**{¶101}** Accordingly, appellant's sixth assignment of error is without merit and is overruled.

**{¶102}** For the reasons stated above, the trial court's judgment is hereby affirmed.

DeGenaro, J., concurs.

Robb, P.J., concurs.